UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DEREK JOSEY,

          Plaintiff,
                     9:11-CV-0028
v.                       (NAM/TWD)

DAVID ROCK, P. HEATH,
E. RUSSELL, CAPT. HOLDRIDGE,
W. REDMOND, SARAH HICKS,
JANE DOE, DR. THOMPSON,
R. RAO, DR. ADAMS,
M.D. LESTER WRIGHT, B. FISCHER,

          Defendants.
_____

APPEARANCES:            OF COUNSEL:

DEREK JOSEY, 01-A-5108
Plaintiff *pro se*
Five Points Correctional Facility
Caller Box 119
Romulus, New York 14541

HON. ERIC T. SCHNEIDERMAN      ADELE M. TAYLOR-SCOTT, ESQ.
Attorney General for the State of New York  STEPHEN M. KERWIN, ESQ.
Counsel for Defendants
The Capitol
Albany, New York 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

   This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Norman A. Mordue,

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff

Derek Josey claims that Defendants violated his Eighth Amendment right to adequate medical care by discontinuing his prescription for a particular pain medication. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 37.) For the reasons discussed below, I recommend that the Court grant Defendants' motion.

I.  **FACTUAL AND PROCEDURAL SUMMARY**

Plaintiff, an inmate in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), was shot in the back prior to entering the DOCCS system and underwent surgery for his injuries. (Dkt. No. 1 at 4; Dkt. No. 37-2 ¶ 13.) At Great Meadow Correctional Facility, Plaintiff was prescribed Ultram, a pain medication. (Dkt. No. 1 at 3.) Ultram is intended for short-term use and induces drug-seeking behavior in patients who consume it for long periods. (Dkt. No. 37-2 ¶¶ 4, 8-9.) It can cause kidney damage and should not be used by patients who are also taking a selective serotonin reuptake inhibitor ("SSRI") because that drug combination can induce seizures. (Dkt. No. 37-13 ¶ 8.) Because Ultram is addictive and can produce a high if consumed inappropriately, it has been the object of much abuse among DOCCS inmates. (Dkt. No. 37-2 ¶¶ 1, 7.) Inmates have been known to crush Ultram and snort the pulverized pills. *Id*. ¶ 10. Bartering with Ultram pills among inmates has been a common occurrence in DOCCS facilities. *Id*. ¶ 11.

Defendant David H. Thompson, a doctor at Great Meadow, first saw Plaintiff on February 12, 2008. (Dkt. No. 37-11 ¶ 10.) Plaintiff told Defendant Thompson that the dosage he was receiving of Ultram was not relieving the pain in his back. *Id*. Defendant Thompson increased Plaintiff's's dosage. *Id*. The next day, Plaintiff refused his evening dose. *Id*.

2

On March 17, 2008, the nurse who delivered Plaintiff's medication noted that Plaintiff had tried to conceal his pills under his tongue. *Id*. ¶ 11. The nurse requested that Plaintiff's medication be discontinued. *Id*. Upon receiving that report, Defendant Thompson discontinued Plaintiff's Ultram. *Id*. ¶ 12. Defendant Thompson declares that the "behavior recorded in the nurse's March 17 note, and the plaintiff's refusal of his medication the day after insisting that he needed more of it raised my suspicion that the plaintiff was obtaining the medication for other than a legitimate medical need. In addition, he had been on [the medication] for a long time and I thought it would be wise to see if he could get by without [it], particularly in light of the nurse's notation that he was in no acute distress and that he walked, sat and stood well." *Id*.

After Defendant Thompson discontinued Plaintiff's Ultram prescription, Plaintiff repeatedly wrote to him seeking restoration of the prescription. *Id*. ¶ 13. Defendant Thompson saw Plaintiff again on April 29, 2008. *Id*. ¶ 14. Plaintiff reported that his back pain persisted. *Id*. Because Plaintiff's need for pain relief seemed genuine and because Plaintiff had been off of the medication for a month, Defendant Thompson restored the prescription. *Id*.

On July 7, 2008, Defendant Eileen Russell wrote a memorandum regarding Plaintiff to Defendant William Redmond, the Nurse Administrator at Great Meadow. (Dkt. No. 37-9 ¶ 7.) At the time of the events giving rise to this lawsuit, Defendant Russell was the Assistant Deputy Superintendent for Mental Health Programs at Great Meadow. (Dkt. No. 37-9 ¶ 2.) In that position she was responsible for the operation of the facility's Behavioral Health Unit ("BHU"). *Id*. BHUs are collaborative efforts between DOCCS and the Office of Mental Health that provide intensive levels of mental health services to inmates prone to disciplinary infractions. *Id*. ¶¶ 3-4. BHUs are staffed with combinations of security personnel and therapists who comprise

"treatment teams." *Id.* ¶5. Treatment teams receive frequent informal reports about individual inmates' positive and negative behaviors. *Id*. ¶ 6. Treatment teams do not include medical staff. *Id*. ¶ 7. Defendant Redmond was part of the medical staff at Great Meadow and, as such, was responsible for providing medical services to both BHU and general population inmates. *Id*. Defendant Russell's memorandum stated:

> Inmate Josey . . . was caught trying to flush meds down the toilet in his cell today. The officer was able to retrieve the rubber glove tip that he had the meds in and upon examination all he saw was dissolved pills. Can inmate Josey's meds be crushed or given to him in liquid form? Considering we had an incident this weekend with [another inmate] trying to hang himself we don't want anyone hoarding their meds in case they really want to harm themselves. Please advise and thanks.

(Dkt. No. 37-10 at 1.) In response, Defendant Redmond asked if an informational report had been written about the incident and, if so, if he could have a copy for the medical provider to provide justification for the "crush order." *Id*. When patient is under a "crush order," his medications are crushed and administered to him in a pulverized form with water to minimize the possibility of him secreting the medication for illicit purposes. (Dkt. No. 37-11 ¶ 15.) Defendant Russell replied that an informational report had been written and that she would "send it over today." (Dkt. No. 37-10 at 1.)

Defendants have not been able to locate a copy of the informational report. (Dkt. No. 37-9 ¶ 9.) Plaintiff contends that Defendant Russell's memorandum was a lie and that a copy of the informational report stating that Plaintiff was discovered flushing medication down the toilet cannot be found because there was no such report. (Dkt. No. 37-6 at 80:20-83:5.[1]) Other

---

[1] Citations to page numbers in the transcript of Plaintiff's deposition refer to the page number in the original document rather than to the page number assigned by the Court's

4

contemporaneous records support the existence of an informational report, although they do not indicate who authored it. For example, minutes from a meeting of Plaintiff's treatment team dated July 8, 2008, state that Plaintiff was "agitated about an informational report he received." (Dkt. No. 38-1 at 5.)

When Defendant Thompson learned of Plaintiff's actions, he ordered that Plaintiff's Ultram be discontinued. (Dkt. No. 37-11 ¶ 16.) He declares that Plaintiff's Ultram was discontinued "per my order, and . . . none of the other defendants from Great Meadow . . . or from DOCCS' Central Office . . . had anything to do with my medical decision to terminate the plaintiff's Ultram based upon his suspected abuse of that medication and the two and half months that he had been taking it. . . . [M]y interest, aside from stopping the plaintiff's potential abuse of the medication, was to see if he could manage without a medicine which was designed for treatment of acute rather than chronic pain." *Id*.

Defendant Thompson declares that "[t]ermination of the plaintiff's Ultram produced an aggressive response from the plaintiff to the point where, on one occasion, he had to be escorted out of the medical clinic by Correction Officers after exhibiting belligerent behavior toward me." *Id*. ¶ 17.

After Defendant Thompson discontinued Plaintiff's Ultram, Plaintiff's was supplied with ibuprofen when he complained of pain. *Id*. Plaintiff occasionally declined to accept the ibuprofen, stating that it did him no good. *Id*.

Defendant Thompson saw Plaintiff again on August 12, 2008. *Id*. ¶ 18. Plaintiff complained of back pain. *Id*. Defendant Thompson "decided to give the plaintiff the benefit of

---

electronic filing system.

the doubt and reinstate his Ultram prescription. . . . I also ordered that the pills be crushed before they were given to the plaintiff to inhibit any effort on his part to hoard rather than properly consume the medication." *Id*.

On two occasions after Defendant Thompson reinstated Plaintiff's Ultram prescription, Plaintiff protested that the crushed pills given to him in water were ineffective. *Id*. ¶ 19. Defendant Thompson declares that "[o]f course this method of administration would do nothing to diminish the potency of the medication." *Id*.

Plaintiff was transferred from Great Meadow to Attica Correctional Facility on or about September 8, 2008. *Id*. ¶ 20. At the time of his transfer, Plaintiff had a valid prescription for Ultram. *Id*.

Defendant Jadow Rao is, and was at the time of Plaintiff's transfer, the Health Services Director at Attica. (Dkt. No. 37-12 ¶ 2.) As such, he is responsible for all medical care provided to the inmates at Attica. *Id*. He directly supervises the physicians, physician assistants, nurses, and non-medical staff of the Attica medical department. *Id*. Defendant Rao declares that "[u]pon undertaking the care of a new patient, . . . I do not regard myself as being bound by a prior physician's determinations as to treatment, and I certainly do not regard myself bound by [a] patient's requests for particular courses of treatment, particularly when it comes to addictive prescription medications." (Dkt. No. 37-12 ¶ 7.) Defendant Rao declares that every effort is made to switch newly-arriving inmates from Ultram to "other, less troublesome pain relievers." *Id*. ¶ 11.

Defendant Rao declares that when Plaintiff arrived at Attica, his Ultram prescription was continued until Defendant Rao could review his records. *Id*. ¶ 8. Defendant Rao reviewed

Plaintiff's medical records on October 1, 2008. *Id*. ¶ 9. Defendant Rao "found that the plaintiff had a history of hoarding his medication, and also flushing it in the toilet. . . . This history and the nature of the medication the plaintiff had been taking caused me concern. The history indicated to me that either the plaintiff did not need the medication, that he was improperly consuming it, or that he was using it to barter with other inmates for favors or to obtain other contraband items." *Id*. Defendant Rao discontinued Plaintiff's Ultram prescription and noted that Plaintiff could have Motrin for pain relief. *Id*. ¶ 11. Defendant Rao repeated this direction after seeing Plaintiff on October 23, 2008. *Id*.

Defendant Rao declares that Plaintiff's medical record is "replete with entries documenting the all-too-familiar reaction by a[n] Ultram-dependent patient to the withdrawal of that medication." *Id*. ¶ 12. Plaintiff refused offers of over-the-counter medications. *Id*. ¶¶ 12, 14. Plaintiff was prescribed other prescription pain relievers, but on at least one occasion it was discovered that Plaintiff was not taking the medication and had failed to request a refill. *Id*. ¶¶ 13-14. This reinforced Defendant Rao's "suspicion that the plaintiff's desire for Ultram - which he invariably requested by name - was sought, not for pain relief, but for some illicit purpose." *Id*. ¶ 14. During this same time period, an x-ray of Plaintiff's lumbar spine showed a "normal lumbar spine." *Id*. ¶ 13.

Plaintiff was referred to physical therapy in January 2009 and attended twice a week from March 9, 2009, through April 20, 2009. *Id*. ¶ 15. The physical therapist concluded that the therapy was not effective in relieving Plaintiff's pain, but also noted that Plaintiff was not performing the recommended exercises between therapy sessions. *Id*.

After completing physical therapy, Plaintiff was seen by non-defendant physician Stephen

7

Laskowski at Attica. *Id*. ¶ 16. Dr. Laskowski agreed to consider prescribing Ultram if Plaintiff received a recommendation for it from a pain management specialist. *Id*.

Plaintiff saw a pain management specialist on July 28, 2009, who made a number of recommendations. *Id*. ¶ 17. One of these recommendations was that "consideration be given to restarting Ultram." *Id*. Upon reviewing the specialist's report, Dr. Laskowski prescribed Ultram for Plaintiff. *Id*. ¶ 18. This prescription continued until Plaintiff was transferred out of Attica to Clinton Correctional Facility on October 19, 2009. *Id*.

At Clinton, Plaintiff demanded Ultram from a nurse practitioner . (Dkt. No. 37-13 ¶ 11.) The nurse observed that Plaintiff was in no acute distress, presented no non-verbal signs of pain, was able to lean forward on the table, and was generally argumentative and demanding. *Id*. The nurse practitioner informed Plaintiff that she would not prescribe Ultram for degenerative disc disease and proposed a course of a non-steroidal anti-inflammatory drug and a muscle relaxer. *Id*. Plaintiff said, "Whatever. I'll be on sick call every day until I get my Ultram back." *Id*. The nurse practitioner terminated the encounter because Plaintiff continued to be argumentative and displayed drug-seeking behavior. *Id*.

Defendant Richard N. Adams, a doctor at Clinton, examined Plaintiff for the first time on March 1, 2010. (Dkt. No. 37-13 ¶ 12.) His assessment was that Plaintiff suffered from low back pain. *Id*. Defendant Adams did not renew Plaintiff's prescription for Ultram because Plaintiff's pain was long-standing and unchanged and Ultram is intended for acute, not chronic, pain. *Id*. Defendant Adams declares that Ultram needs to be taken at least three times a day to maintain pain reduction because it is a short-acting pain reliever. *Id*. ¶ 8. He declares that at Clinton "the staffing level is insufficient to administer medications three times a day, thus medication like

Ultram that generally needs to be administered one-on-one and more than twice a day presents logistical problems. For these reasons, I and other physicians at Clinton are cautious in prescribing it, and make every effort to find alternatives for those inmates who come under our care who are already on it." *Id*.

Defendant Adams next saw Plaintiff on April 6, 2010. *Id*. ¶ 13. Plaintiff, who had previously been told that he could not have Ultram because he was taking psychiatric medications, informed Defendant Adams that "his psychiatric medications were stopped because he did not need them." *Id*. On physical exam, Plaintiff's deep tendon reflexes were equal side to side, he had no pain on straight leg raising, his gait was normal, there was no radiation of back pain, and Plaintiff did not report any functional problems with activities of daily living. *Id*. Plaintiff asked for Ultram and Defendant Adams declined to provide it. *Id*.

Defendant Adams next saw Plaintiff on September 28, 2010. *Id*. ¶ 14. A physical examination was unrevealing but a CT scan showed disc degeneration at the L-5, S-1 level. *Id*. Defendant Adams prescribed a one-week trial of Indocin for pain relief. *Id*

Defendant Adams next saw Plaintiff on October 29, 2010. *Id*. ¶ 15. Plaintiff reported that the Indocin caused him to "freak out." *Id*. Plaintiff told Defendant Adams that he "received 100% relief from taking Ultram twice a day." *Id*. Defendant Adams found this significant because Ultram is a short-acting pain reliever that is generally effective for no more than six hours. *Id*. He thus found it "unlikely that the plaintiff obtained 'total relief' of his pain from Ultram taken only twice a day . . . This, combined with his aggressive demands for Ultram, demanding it by name, and the inconsistency between his complaints and my findings on physical examination heightened my suspicion that the plaintiff sought Ultram for other than pain

9

relief." *Id*. Defendant Adams prescribed Feldene and a Medrol dose pack for pain relief and requested approval for an electromyography and a nerve conduction study of Plaintiff's left leg. *Id*.

Defendant Adams saw Plaintiff again on December 8, 2010. *Id*. ¶ 16. Plaintiff said that Feldene did not work and that Ultram was the only medication that provided him relief. *Id*. After a physical examination, Defendant Adams' assessment was that plaintiff had low back pain with mild degenerative disc or joint disease in his spine and exhibited drug-seeking behavior. *Id*. Defendant Adams recommended that Plaintiff use over-the-counter medications like aspirin, Tylenol, or ibuprofen to manage his pain. *Id*.

On December 30, 2010, Plaintiff was seen by another doctor at Clinton. *Id*. ¶ 17. The doctor authorized Voltaren twice a day for pain. *Id*. On January 3, 2011, Plaintiff complained to the nurse on sick-call duty that he had yet received the prescription, which he characterized as being for Ultram. *Id*. The nurse, apparently unable to read the doctor's December 30 note, believed the prescription was for Ultram. *Id*. She asked Defendant Adams to sign a prescription for Ultram. *Id*. Defendant Adams signed the prescription without recognizing the identity of the patient. *Id*. Plaintiff thus received Ultram on January 4 and 5, 2011. *Id*. When Defendant Adams discovered this on January 5, 2011, he discontinued the Ultram because he believed that Plaintiff was taking an SSRI and the drug combination put Plaintiff at risk of seizures. *Id*.

Plaintiff saw a physician assistant on March 24, 2011. *Id*. ¶ 19. He requested Ultram and advised the physician assistant that his SSRI had been discontinued. *Id*. The physician assistant prescribed Ultram. *Id*. Plaintiff first received Ultram under that prescription on March 25, 2011, and continued receiving it until mid-June 2011. *Id*.

On June 15, 2011, Plaintiff argued with a nurse over the procedure for receiving Ultram. *Id*. ¶ 20. Under the required procedure, Plaintiff was to appear at the front of his cell with a cup of water, prepared to take the medication from the nurse and swallow it in her presence. *Id*. Plaintiff wanted to put the pill in his mouth and turn away from the nurse to get water from his sink, where he would seemingly swallow the pill. *Id*. The nurse asked Defendant Adams to review the matter. *Id*. Upon reading the nurse's note, Defendant Adams determined that it appeared that Plaintiff was attempting to hoard the medication. *Id*. On June 17, 2011, Defendant Adams discontinued Plaintiff's Ultram prescription. *Id*.

Plaintiff was transferred away from Clinton on June 23, 2011. *Id*. ¶ 21.

Plaintiff wrote grievances and letters of complaint regarding his desire for Ultram. (Dkt. No. 1 at 3.) Plaintiff received responses to some of these communications from the office of Defendant Lester Wright, the Director of Medical Services for DOCCS. (Dkt. No. 1 at 2; Dkt. No. 37-6 at 108:21-114:20.) Defendant Wright declares that he did not personally handle Plaintiff's complaints. (Dkt. No. 37-4 ¶ 5.)

Plaintiff filed this action on January 10, 2011, while he was still incarcerated at Clinton. (Dkt. No. 1.) Plaintiff seeks a declaration that Defendants violated his Eighth Amendment right to adequate medical care, an injunction ordering Defendants to "[i]mmediately provide Plaintiff with consultation to a pain specialist of his choice and immediately restore him to his prescribed Ultram medication," compensatory damages, and punitive damages. *Id*. at 5.

Defendants now move for summary judgment. (Dkt. No. 37.) Plaintiff has opposed the motion. (Dkt. Nos. 41 and 43.)

11

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id*. at 273. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion

---

[2] A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the

13

material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III. ANALYSIS

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care.[3] (Dkt. No. 1 at 4.) The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id*. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id*. (citing *Hudson v. Palmer*, 468 U.S.

---

[3] Plaintiff does not assert claims under any other constitutional provisions. I note, in particular, that Plaintiff does not claim that any Defendant retaliated against him for any type of protected conduct or discriminated against him based upon his membership in a protected class.

14

517, 526-27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

Here, Defendants concede for the purposes of this motion only that Plaintiff suffered from a serious medical need and has thus established the objective prong of his Eighth Amendment claim. (Dkt. No. 37-15 at 18.[4]) The issue, then, is whether Plaintiff has raised a triable issue of fact that Defendants were deliberately indifferent to that need. I will examine this issue in three parts: (1) medical personnel; (2) non-medical personnel; and (3) Central Office personnel.

1. Medical Personnel

Defendant has sued four medical professionals: Defendants Redmond and Thompson from Great Meadow, Defendant Rao from Attica, and Defendant Adams from Clinton. Defendants argue that Plaintiff has failed to raise a triable issue of fact that the medical providers were deliberately indifferent to Plaintiff's serious medical needs. (Dkt. No. 37-15 at 22-27.)

---

[4] Citations to page numbers in Defendants' memorandum of law refer to the page number in the original document rather than to the page number assigned by the Court's electronic filing system.

Defendants are correct.

Medical mistreatment by a medical provider rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Thus, to establish deliberate indifference by a medical provider, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. Inmates do not have a right to choose a specific type of treatment. *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004). More specifically, "[d]ifferences in opinion between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs." *Wright v. Genovese*, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010) (punctuation omitted).

Here, Defendants Thompson, Rao, and Adams have each filed declarations explaining their reasons for the courses of treatment that they chose for Plaintiff. (Dkt. Nos. 37-11; 37-12; 37-13.) Each of these doctors had concerns that Plaintiff was seeking Ultram for non-medical reasons and that the medication was not the best treatment for Plaintiff's chronic pain. Each examined Plaintiff fairly regularly and attempted to treat his complaints. Plaintiff's claims against these doctors amount merely to a disagreement with the course of treatment they prescribed. Therefore, I recommend that the Court grant Defendants' motion for summary

judgment and dismiss these claims.

Plaintiff has not raised a triable issue of fact that Defendant Redmond, who served as a nurse administrator at Great Meadow, played any role in the decision to discontinue Plaintiff's Ultram prescription. Defendant Thompson declares that Defendant Redmond had nothing to do with the decision. (Dkt. No. 37-11 ¶ 16.) Plaintiff has not presented any evidence disputing that declaration. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claim against Defendant Redmond.

### 2. Non-Medical Personnel at Great Meadow Correctional Facility

Plaintiff has sued five non-medical personnel from Great Meadow. These individuals are Defendants Eileen Russell, David Rock, P. Heath, Capt. Holdridge, and S. Hicks. Plaintiff alleges that Defendant Russell filed a false report stating that he had attempted to flush medication, which resulted in the discontinuation of his Ultram at Great Meadow and followed him to other facilities. (Dkt. No. 1 at 3-4.) Plaintiff alleges that Defendants Rock, Heath, Holdridge, and Hicks violated his Eighth Amendment rights by covering up Defendant Russell's alleged wrongdoing in the course of their investigation into the matter. *Id*. Defendants argue that Plaintiff has failed to raise a triable issue of fact that the non-medical personnel at Great Meadow were deliberately indifferent to Plaintiff's serious medical needs. (Dkt. No. 37-15 at 20-22.) Defendants are correct.

"Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (citation and internal quotation marks omitted). Here, there is no triable issue

of fact that Defendants Russell, Rock, Heath, Holdridge, or Hicks intentionally delayed Plaintiff's access to medical care. The act about which Plaintiff most vigorously complains - Defendant Russell's memorandum - did not delay Plaintiff's access to care. As the document shows, Defendant Russell did not recommend that Plaintiff's prescription be discontinued. (Dkt. No. 37-10.) Rather, she inquired whether a "crush order" would be appropriate. *Id*. Defendant Russell did not engage in any improper conduct and any finding to that effect by Defendants Rock, Heath, Holdridge, and Hicks was not a "cover up," as Plaintiff alleges. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against these Defendants.

        3.        <u>Central Office Personnel</u>

Plaintiff has named Brian Fischer, the Commissioner of DOCCS, and Lester Wright, the Director of Medical Services for DOCCS, as Defendants. (Dkt. No. 1 at 2.) Defendants argue that Defendants Fischer and Wright were not personally involved in any constitutional violation. (Dkt. No. 37-15 at 27-30.) Defendants are correct.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful

conduct. *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).[5]

Here, Defendants Fischer and Wright were not personally involved in any constitutional violation. As discussed above, the discontinuation of Plaintiff's Ultram prescription did not violate his Eighth Amendment rights. Thus, there was no constitutional violation with which to be personally involved. Even if there had been a constitutional violation, there is no indication that Defendants Fischer or Wright were personally involved. A supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement. *Sealey v.*

---

[5] In *Iqbal*, 556 U.S. 662, the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

*Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *see also Wright*, 694 F. Supp. 2d at 161. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Fischer and Wright.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No.37) be **<u>GRANTED</u>**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: March 19, 2013
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge